PYRAMID COAL CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

No. 8317.

Circuit Court of Appeals, Seventh Circuit.

Nov. 30, 1943.

Samuel M. Rinaker, Earl B. Wilkinson, and Samuel W. Witwer, Jr., all of Chicago, Ill., for petitioner.

Fred E. Youngman, Sp. Asst. to the Atty. Gen., and Samuel O. Clark, Jr., Sewall Key, J. P. Wenchel and John T. Rogers, Bureau of Internal Revenue, all of Washington, D. C., for respondent.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

By this action petitioner seeks to review a decision of the Tax Court of the United States which found it liable for deficiencies in unjust enrichment taxes for its fiscal years ending March 31, 1936 and March 31, 1937, together with a penalty for failure to file a return for the latter year. It found that these taxes and the penalty were due from petitioner under section 501(a) (1) of the Revenue Act of 1936, 26 U.S.C.A. Int. Rev.Code, § 700(a) (1). That Act imposed a tax upon income derived "from the sale of articles with respect to which a Federal excise tax was imposed * * * but not paid which is attributable to shifting to others to any extent the burden of such * * * tax * * *."

The tax which that court found had been shifted to others by petitioner was imposed by the Bituminous Coal Conservation Act of 1935, 49 Stat. 991, which became effective on November 1, 1935, and was declared unconstitutional by the Supreme Court of the United States, May 18, 1936. It imposed a tax of 1½ per cent of the sales price of the coal which petitioner produced. That tax is referred to as the "Guffey tax," and none of it was paid by petitioner.

Petitioner contends that it did not shift any of such tax, and that the Tax Court's finding is not supported either by evidence or by legal presumption. The following

facts are supported by uncontradicted evidence. Petitioner is an Illinois corporation engaged in the business of mining and selling bituminous coal. It was incorporated in 1928, and until January 1, 1935, it operated but a single mine known as the Pyramid. On that date it acquired two additional mines known as the Danville and the Pyott mines. In the taxable years here involved it operated the three mines.

Petitioner's sales of coal were of two general types, those under long-term contracts, and those under short-term contracts, or those referred to as "spot market" sales. The long-term contracts were with the Missouri Pacific Railroad Company, Chicago Great Western Railroad Company, Terminal Railroad Association of St. Louis, and Universal Coal Washing Company. The contract with the Missouri Pacific Railroad Company was made in 1928 and provided for purchase by the railroad of between 4,000,000 and 6,000,000 tons of coal to be delivered in as nearly equal monthly installments as possible during a period of ten years. The contract with the Chicago Great Western Railroad Company was entered into in 1929 and provided for the purchase of between 1100 and 1600 tons of coal per day. The contracts with the Terminal Railroad and the Universal Coal Washing Company were entered into in the respective years of 1934 and 1935. All of the long-term contracts provided for definite prices for the coal which could be varied only in the event of changes in labor costs. Most of the coal sold under the long-term contracts was produced at the Pyramid mine, with a small amount coming from the Pyott mine. None of the coal sold under the long-term contracts was produced at the Danville mine.

On October 1, 1935, petitioner, as a member of the Illinois Coal Operators' Association, entered into a new contract with the United Mine Workers of America providing for substantial wage increases for its mine workers. On that date the sales prices of coal under contract with the railroads were increased five cents a ton, and petitioner paid such higher wages beginning October 1, 1935, throughout the taxable years.

Petitioner negotiated with the Universal Coal Washing Company for an increase in price of four cents per ton, due to the wage scale increase. This agreement became effective March 1, 1936.

Approximately 72% of petitioner's total production during the fiscal year ending March 31, 1936, and approximately 63% thereof during the period from April 1, 1936, to May 18, 1936, was sold to the three railroads and the Universal Coal Washing Company. The remainder was sold on the "spot market" or under short-term contracts, through petitioner's sales agency, Binkley Coal Company. That company, in addition to acting as exclusive sales representative for petitioner, was also sales agent for other producers. While Binkley Coal Company fixed the prices of coal sold by petitioner on the "spot market" and under short-term contracts, those prices were controlled by petitioner.

The Bituminous Coal Conservation Act of 1935 became effective November 1, 1935. Under that Act, Binkley Coal Company, on behalf of petitioner and all other producers represented by it, sought to pass the amount of this tax on to all purchasers on the "spot market," and added the excise tax in invoicing the purchasers. Binkley Coal Company was forced to drop this procedure after about ten days because customers refused to pay the tax, and it found that competitors were not adding the tax to the price of the coal. Hence it made credit adjustments to all vendees covering the amount of the tax. After that time there was no sale made of petitioner's coal which included the tax as a part of the price, and customers were advised that they would not be charged the excise tax.

Petitioner sought to collect the tax from the three railroads with which it had long-term contracts. They refused to pay the tax on the ground that their contracts did not provide for a price change because of that tax. Within a very short time petitioner was forced to discontinue this practice and subsequently issued credit memoranda in the full amount of the excise tax so added to the invoices.

Coals from the Pyramid and Pyott mines were in the same classification. They were both sold under long-term and short-term contracts and on the "spot market." Coal from the Danville mine had a lower BTU content than that produced at the Pyramid and Pyott mines and was classified differently. It was sold at a higher price per ton than the coal at the other mines because that mine was so located that the coal could be sold in the local or peddler market to domestic consumers. The selling price of

"spot market" coal in the Midwestern area customarily advanced in winter months because of the seasonal demand. It was during the winter months, for the most part, that the Guffey excise tax was in effect. Normally, the winter price of the coal produced at the Danville mine exceeded so-called summer prices of the coal there produced by from 12 cents to 20 cents per ton.

The productive capacity of the mines in the Middle West, Illinois, Indiana and Western Kentucky, exceeded the demand for coal in the markets served by those mines in 1935 and 1936. During that time prices were fixed to meet competition and did not take into consideration cost of production.

Undisputed evidence showed the amount of coal mined at the Pyramid mine during the fiscal years ending March 31, 1930 to March 31, 1936, both inclusive; the total and per ton sales price during each year for such coal; the cost of producing such coal; and the total profit and per ton profit in each of those years for the six-year period preceding the incidence of the excise tax. In those years the average selling price of the coal produced at the Pyramid mine was $1.1891 per ton and the profit was 22.63 cents per ton. During the fiscal year ending March 31, 1936, the average selling price was $1.2004 per ton and the profit was 22.37 cents per ton.

For the seven months' period ending October 31 in each fiscal year for the years 1929 to 1935, inclusive, the average selling price of the coal from the Pyramid mine was $1.1803 per ton and the profit was 19.86 cents per ton. During the fiscal year ending March 31, 1936, for the same seven months' period, the average selling price was $1.1849 per ton and the profit was 24.74 cents per ton. During the five months ending March 31, in the pre-tax period, the average selling price of the coal from the Pyramid mine was $1.1998 per ton and the profit was 26.03 cents per ton. During the fiscal year ending March 31, 1936, for said five months' period, the average selling price of the coal from that mine was $1.2169 per ton and the profit was 19.86 cents per ton. The undisputed evidence further

discloses that in April and May, 1936, the average selling price for Pyramid coal was $1.1722 per ton, and for that period in previous years it ranged from $1.1216 to $1.2398 per ton. The average per ton selling price of the coals produced at the various mines from April 1 to May 18, 1936, was as follows: Pyramid mine, $1.2279 per ton; Pyott mine, $1.3760 per ton; Danville mine, $1.5209 per ton.

Petitioner filed an unjust enrichment tax return for the year ended March 31, 1936, and elected to use method 1 as set forth in section 501(e) (1) of the Revenue Act of 1936.[1] Its return for that year showed no tax to be due. It filed no return of unjust enrichment tax for the fiscal year ending March 31, 1937.

The Tax Court determined that out of $12,704.77 Guffey tax imposed on petitioner on its sales in the fiscal year ending March 31, 1936, $6,123.06 was shifted to petitioner's customers. It therefore determined unjust enrichment tax deficiencies in respective amounts of $4,056.53 and $1,755.93 for the fiscal years ended March 31, 1936 and March 31, 1937, being 80% of the respective amounts of the Guffey excise tax so determined by the Court to have been shifted, less certain statutory credits for income and excess profit taxes. It also assessed the sum of $493.98 against the petitioner as a penalty for its failure to file a return for the fiscal year ending March 31, 1937.

The decision of the Tax Court is based on the theory that the evidence adduced disclosed that the selling price of the coal in question exceeded its cost to taxpayer plus the average margin of such coal, under the rule set forth in section 501(e) (1), and that the evidence did not overcome the presumption referred to in section 501(e). The Tax Court arrived at the conclusion that there was such excess by the following methods. It claims to have determined the *average margin,* which is called the base margin, of similar coal, sold by the taxpayer, during its six taxable years preceding the initial imposition of the tax here involved, as that average margin is defined in section 501(f) (1).[2]

---

[1] "501 (e) For the purposes of subsection (a) (1), (2), and (3), the extent to which the taxpayer shifted to others the burden of a Federal excise tax shall be presumed to be an amount computed as follows:

"(1) From the selling price of the articles there shall be deducted the sum of (A)

the *cost* of such articles plus (B) the average margin with respect to the quantity involved; * * *" (Our ital.)

[2] 501(f) "As used in this section—

"(1) The term 'margin' means the difference between the selling price of articles and the cost thereof, and the term 'aver-

In this computation for the base period that court used the *average margin* of the Pyramid mine only, because that was the only mine which taxpayer had operated for as long as six years. However, in computing the *margin* for the taxable periods, as the word *margin* is defined in the same subsection, it used the realization from the three mines when in fact the findings disclose, and it is not contradicted, that the taxpayer did not operate the Pyott or the Danville mine prior to January 1, 1935, and that at all times since that date the coal from the Pyott mine had been sold by taxpayer for more per ton than that from the Pyramid, and the coal from the Danville mine was sold by taxpayer for considerably more per ton than that sold by it from either the Pyramid or Pyott mine. Moreover, it was further found by the Tax Court that most of the coal sold by taxpayer to the railroads under the long-term contracts came from the Pyramid mine, and none of it came from the Danville mine.

In these respects taxpayer contends that the Commissioner's computation, which the Tax Board approved, failed to follow a uniform method in computing *average margin* for the *base period* and *margin* for the *taxable periods*. With this conclusion we are in accord. The sales here involved during the taxable year ending March 31, 1936, were made during the last five months of that fiscal year. During those months the average sale price of coal at the Danville mine was $1.66 per ton; at the Pyott mine, $1.37; and at the Pyramid, $1.21. During the first seven months of that fiscal year the average sales prices of the same mines were respectively $1.4812, $1.2645 and $1.1816. The sales here involved during the taxable year ending March 31, 1937, were made during the period April 1 to May 18, 1936. During that period the average sales prices were respectively $1,-5209, $1.3760 and $1.2279. It is quite apparent that if the higher prices of the Danville and Pyott coals were either eliminated from respondent's computation of *margin* or projected over the base period in his

computation of *average margin* a very much less amount would have resulted which could possibly be presumed to have been shifted to the purchasers.

It seems to us that respondent's computation of the margin and the average margin here involved not only lacks uniformity of treatment but it lacks fairness, in view of the taxpayer's definite affirmative evidence that no part of the Guffey tax was ever shifted to any of its purchasers. That testimony was in no manner controverted, except by the bare presumption referred to in the statute. Furthermore, such affirmative evidence is quite strongly supported by the undisputed facts that taxpayer for the first ten days of November, 1935, attempted to shift the tax to all of its customers by separate items on their invoices. All refused to pay it, and each received a credit memorandum from taxpayer for the item so charged, with assurance from the taxpayer that such practice on its part would thereafter cease. In the long-term contracts the price was definitely fixed. At the spot market, taxpayer sold its coal in competition with competitors, none of whom ever shifted any part of the Guffey tax to its customers. The character of taxpayer's customers, whether by contract or on spot market, the amounts of coal sold to them, the locations of the mines, and the like, all indicate that taxpayer's purchasers were well informed as to the prevailing sales prices and would have readily detected any attempt to shift the tax to them. After November 10, 1935, none of them ever made complaint of such attempt, and the uncontradicted testimony adduced by taxpayer is that no such attempt was ever made after that date, and that at no time was any part of the Guffey tax shifted to any of its customers.

In Norwood-White Coal Company v. Commissioner, 45 B. T. A. 638, it was held that such and similar evidence must be considered by the court with the other proof offered by petitioner. That court did consider it and held that the petitioner had established that the burden of the tax

---

age margin' means the average difference between the selling price and the cost of similar articles sold by the taxpayer during his six taxable years preceding the initial imposition of the Federal excise tax in question, except that if during any part of such six-year period the taxpayer was not in business, or if his records for any part of such period are so inadequate as not to furnish satisfactory data, the average margin of the taxpayer for such part of such period shall, when necessary for a fair comparison, be deemed to be the average margin, as determined by the Commissioner, of representative concerns engaged in a similar business and similarly circumstanced."

was not shifted to its vendees, and noted that under section 501(i), the presumption set forth in section 501(e) was a rebuttable one. See also Clinchfield Coal Corporation v. Commissioner, 47 B. T. A. 151; Epstein v. Helvering, 4 Cir., 120 F.2d 427.

It is quite true that section 501(f)(1), which fixes the base period for the determination of average margin, does not authorize a shorter period than six years to be considered for that purpose; nor does it specifically authorize for that purpose the comparison of the margin of certain seasons of any base or taxable year with another season of the same year or of any other base or taxable year. In this respect the Tax Court permitted taxpayer to show as to the Pyramid mine, not only the number of tons sold, the price received per ton, and the cost per ton, for each of the base years, and the taxable year ending March 31, 1936, but also the same information separately with respect to the first seven months and the last five months of each of those years. However, the Tax Court was of the opinion that such information as to the two periods last mentioned was not helpful in the determination of either the *average margin* of the base period or the *margin* of the taxable period, as contemplated by the statute. We think such evidence does very clearly disclose the futility of attempting to establish the *average margin* of the three mines upon all the evidence adduced. This we think could not be done because taxpayer had not operated the Pyott and Danville mines prior to January 1, 1935.

Section 501(f) (1) provides the procedure for such cases in the following language: "* * * if during any part of such six-year period the taxpayer was not in business, or if his records for any part of such period are so inadequate as not to furnish satisfactory data, the average margin of the taxpayer for such part of such period shall, when necessary for a fair comparison, be deemed to be the average margin, as determined by the Commissioner, of representative concerns engaged in a similar business and similarly circumstanced." We think this subsection and the undisputed facts here presented required the Commissioner to determine the *average margin* for that part of such base years prior to January 1, 1935, not disclosed by petitioner's records by a fair comparison with the average margin, for such period of

representative concerns engaged in a similar business and similarly circumstanced. To be sure this is not permitted, by an earlier clause of this subsection, unless during some part of such six-year period the taxpayer was not in *business,* or unless its records for any part of such period are so inadequate as not to furnish satisfactory data. It is to be noted that this clause does not limit the word *business* to any particular kind of business. However, we think it must be conceded that Congress intended that the word "business" as there used should mean the same business, and one that is similarly circumstanced to that of the taxable year, just as it is limited in the last sentence of that subsection.

Of course taxpayer was in the coal business, as operator of the Pyramid mine only, during all the base period of both taxable years, and, indeed, it was still in the coal business after it began to operate the Pyott and Danville mines on January 1, 1935. However, this is the only point of similarity between the business of both periods, and to say that the business of both periods is the same and is "similarly circumstanced" is to say something which has no factual foundation.

Furthermore, taxpayer's records certainly were so inadequate as not to furnish satisfactory data from which to compute the average margin of the Pyott and Danville mines. This is not due to errors in bookkeeping or to any other fault of taxpayer, but it was due to the fact that it had not operated those mines prior to January 1, 1935. This fact constituted a separate and sufficient reason under the statute why the Commissioner should have determined the average margin by a fair comparison with other representative concerns engaged in a similar business and similarly circumstanced, and that burden was on the Commissioner. However, he insists that this is not a case which calls for the use of comparatives, merely because the taxpayer was in the coal business during the base period. This contention is based upon a very literal construction of the word "business" as first used in that subsection. The same literalness of definition would result in an absurdity, for so long as taxpayer was engaged in any kind of business during the base years it would not be entitled to a determination of its margin in its taxable years by comparison with representative concerns engaged in *"a similar business and similarly circumstanced."*

We think the intention of Congress can be ascertained only by interpreting the subsection as a whole, for then we find that the word *business* as first used, is specifically defined in the quoted phrase of the last clause. To hold otherwise we think would render the enactment invalid. See Mobile, J. & K. R. Co. v. Turnipseed, 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78, 32 L.R.A., N.S., 226, Ann.Cas.1912A, 463; Manley v. Georgia, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575; Epstein v. Helvering, 4 Cir., 120 F.2d 427. The facts upon which these cited cases rest are not the same as those before us, but they do enunciate a general principle which we think is controlling, and by it we are convinced that the presumption now in controversy, as applied by respondent, would be invalid because it would operate arbitrarily and capriciously and would be lacking in any logical connection between the fact presumed and the fact upon which it is based.

The taxpayer further contends that the Commissioner erred in computing the margin and average margin in that he deducted as cost from the selling price only the amount of depletion at the Pyramid mine and the royalties paid to the fee owners of the Pyott and Danville mines. The taxpayer insists that he should have deducted also the actual cost of producing the coal as a commercial article. The evidence discloses with exactness the actual cost of producing the coal for market at the Pyramid mine. This cost included operating labor and supplies, fixed charges, general operating expenses and administrative expenses. We are unable to conceive why such cost should not have been deducted from the sales price in both the base years and the taxable years. In Gillan v. Commissioner, 45 B. T. A. 757, all costs of production of the material *ready for market,* as well as depreciation, were deducted from the selling price, both in the taxable years and in the base years, and we see no reason why the undisputed facts in this case should not be accorded the same treatment. The theory of the respondent in this respect is that section 501(e) (1) permits only the cost of the article (which he conceives to be unmined coal) to be deducted from the selling price of the article sold, hence he argues that the amount of depletion for the periods involved fairly represents the cost of the article sold. We are convinced, however, that coal in the ground is altogether a different article from coal which

has been mined and made ready for market. It seems to us that the cost of production is not and cannot be reflected in the amount of depletion. It is argued by the Commissioner, however, that the cost of production may be reflected in the margin or average margin. That might be true, but it certainly is not true in this case because the cost of production is specifically set forth in each of the years here involved, and is deducted from the sales price in the computation of both the margin and the average margin. This evidence is undisputed and we think it cannot be arbitrarily disregarded.

A statement of the facts with respect to operations of taxpayer during both taxable years is clearly set forth in the record. It is undisputed and we think clearly shows that the petitioner absorbed the entire amount of the Guffey tax imposed in both taxable years and that it has overcome the presumption of section 501 (e).

The decision of the Tax Court is reversed.