## REPUBLIC COTTON MILLS v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5303.

Circuit Court of Appeals, Fourth Circuit.

Jan. 31, 1945.

J. Craig Peacock and John W. Townsend, both of Washington, D. C., for petitioner.

Newton K. Fox, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen.,

and Sewall Key, A. F. Prescott, and F. E. Youngman, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This petition for review relates to a decision of the Tax Court which denied a claim for refund of processing taxes in the sum of $435,340.73 paid by Republic Cotton Mills, a South Carolina corporation, on the output of three mills under the Agricultural Adjustment Act of May 12, 1933, 48 Stat. 31, 7 U.S.C.A. § 601 et seq. The Act was declared unconstitutional in January, 1936, in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, and Rickert Rice Mills v. Fontenot, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513. Thereafter Congress repealed the Act and prescribed the conditions for refund of the tax by Title VII, §§ 901 to 917 of the Revenue Act of 1936, 49 Stat. 1648, 7 U.S.C.A. §§ 623 note, 644–659. Jurisdiction to pass upon claims for refund was lodged in the Commissioner of Internal Revenue, subject to review by a Board of Review established in the Treasury Department; and subsequently the Board of Review was abolished and the jurisdiction vested therein was transferred to the Board of Tax Appeals, now the Tax Court, by § 510(j) of the Revenue Act of 1942, 56 Stat. 967, 26 U.S.C.A. Int.Rev.Acts.

Section 902 of the Revenue Act of 1936 prohibits any refund of the tax unless the claimant establishes that he bore the burden of the tax and has not been relieved thereof nor reimbursed therefor, nor shifted the burden of the tax in any manner whatsoever.

Section 907 prescribes rules of evidence and presumptions to be used in the determination of claims for refund. Section 907(a) provides: "Where the refund claimed is for an amount paid or collected as processing tax, as defined herein, it shall be prima-facie evidence that the burden of such amount was borne by the claimant to the extent (not to exceed the amount of the tax) that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before and after the tax. If the average margin during the tax period was not lower, it shall be prima facie evidence that none of the burden of such amount was borne by the claimant but that it was shifted to others."

The average margin for the tax period and the average margin for the period before and after the tax are computed in the same way. The average margin for each period is the average of the margins for all of the months therein. The margin for each month is computed as follows: "From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month and deduct the processing tax paid with respect thereto. The sum so ascertained shall be divided by the total number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month." Section 907(b) (1) and (2).

The average margins for each period are ascertained in the same manner as the monthly margins by using "total gross sales value, total cost of commodity processed, total processing tax paid, and total units of commodity processed, during such period." Section 907(b) (3).

Where the articles produced and sold by the claimant are the product of several commodities combined during processing, the average margins are established with respect to such commodities as a group and not individually. Section 907(b) (4).

The "tax period" means the period during which the claimants paid the tax. In this case the tax period was August 1, 1933, to March 31, 1935. The "period before and after the tax", hereinafter called the base period, means the twenty-four months immediately preceding August 1, 1933, the effective date of the tax, and the six months, February to July, 1936, inclusive. Section 907(c).

The presumptions established by Section 907(a), however, are not conclusive. Section 907(e) provides in part as follows: "Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to—(1) Proof that the difference or lack of difference between the average margin for the tax period and the average margin for the period before and after the tax was due to changes in factors other than the tax. Such factors shall in-

clude any clearly shown change (A) in the type or grade of article or commodity, or (B) in costs of production."

The claim for refund in the pending case was rejected by the Commissioner. Appeal was taken to the Board of Review and a hearing was had at which a great volume of testimony was taken and a large number of exhibits was filed. The presiding officer of the Board filed recommended findings of fact in extenso and a recommended decision adverse to the claims without opinion or discussion; and the case was argued before the Board. But the Board was abolished before rendering a decision, and the case was then submitted to the Tax Court on the records and briefs. The court adopted, with slight modifications, the findings recommended by the presiding officer of the Board and filed a brief opinion wherein, without discussion of its findings of fact or their bearing on the matter in dispute, it rejected the claim for refund in toto. It pointed out the admission of the claimant that in common with the rest of the industry it had tried to pass the tax on and showed that the statutory margins on the goods processed in its three mills, considered as a single entity, created a presumption against the claimant. It rejected the claimant's contention that the statutory margin of Mill 3 should be determined separately from that of Mills 1 and 2, since the business of Mill 3 was entirely separate and distinct from that conducted in Mills 1 and 2.

In this connection the court said: "We are unable to agree with petitioner's treatment of the mills as separate businesses and cannot approve the consequences claimed to result from such treatment. We have found that despite the maintenance of separate books of account, the manufacture of different products, the employment of different sales agencies, and the maintenance of separate organizations for Mills 1-2 and Mill 3, the business of petitioner was carried on and maintained as a single business venture. On the facts before us we are of the opinion that petitioner's business must be treated as a single business entity in the solution of the problem presented."

The court also referred to the claimant's arguments that it was prevented by competitive conditions from passing on the tax to the buyers, and that the extent of the burden borne by it could best be measured by comparison of prices before and after the imposition of the tax; but the court deemed it unnecessary to discuss these contentions or to determine the precise weight to be given to each of the factors advanced, and merely said that their aggregate weight was insufficient to convince them that the claimant bore the burden of any part of the processing tax which it had paid.

■ We come at once to the holding of the court that in computing the statutory margins contemplated by Section 907 of the Act, the margins ascertained with respect to goods processed in Mills 1 and 2 should be combined with the margins ascertained with respect to goods processed in Mill 3 in order to determine the margins applicable to the business as a whole. We think that the findings of fact made by the court require the conclusion that this method of computation was erroneous as a matter of law.

The business conducted at the three mills was carried on by claimant as a single business venture. Mills 1 and 2, however, were operated as a single manufacturing unit with one superintendent and operating organization. Their production during the tax period was confined to five standard constructions of coarse cotton grade goods made from carded yarns produced from short staple cotton in the print cloth division of the textile industry. Mill 3, located three-fourths of a mile from Mills 1 to 2, was operated separately with its own superintendent and operating organization; it maintained separate accounts, except accounts receivable and payable; it sold its products through a different sales agency; its products lay in a division of the industry separate and apart from the manufacture of coarse goods and consisted in the manufacture of a constantly changing line of fine goods and specialties which were made from combed yarns produced from higher priced long staple cotton. The goods were composed at various times of a cloth of all-cotton, a cloth of mixed cotton and rayon, a cloth of mixed cotton and silk, or a cloth of all-rayon. During the tax period Mill 3 made over 50 different constructions in 500 or more styles.

None of the short staple cotton used by Mills 1 and 2 was mingled with the long staple cotton used by Mill 3 or vice versa. The manufacturing processes were separate and distinct and the two types of cotton were not combined in the finished products.

The two kinds of cotton were bought and manufactured at different costs and sold on different markets. During the tax period Mills 1 and 2 processed 8,249,683 pounds of short staple cotton at an average cost of 12.5c per pound while Mill 3 processed 2,114,547 pounds of long staple cotton at an average cost of 14.2c per pound; the average manufacturing cost per pound in Mills 1 and 2 was 12.39c while in Mill 3 it was 42.83c; and the average sales value of the finished product derived from a pound of cotton in Mills 1 and 2 was 34.3c while in Mill 3 it was 65.8c.

The uncontradicted evidence shows that during the tax period there was an overproduction of textile goods generally and a resulting buyers' market, and that in such a market a greater loss is suffered in the more expensive fabrics than in staple goods. During this period the court found that the claimant realized a net operating profit of $274,637.89, but Mill 3 showed a loss of $89,708.99 in the production of cotton fabrics. This loss on Mill 3 was inclusive of the processing tax paid of $88,810.97 and also represented the excess of costs of raw material, manufacture and selling over the sale price. Of the tax paid, the claimant admitted the shifting of $6,722.43 and claimed a refund of $82,088.54.

It was conceded, in view of these facts, that the statutory margins could be ascertained only by computing them separately for Mills 1 and 2, on the one hand, and Mill 3 on the other. So computed, the average margin per unit of Mills 1 and 2 during the tax period under section 907(b), i.e., the sum ascertained by deducting the cost of the commodity processed from the gross sales value, was $0.1749856 and for the base period $0.1244652, so that the margin during the tax period exceeded the margin during the base period by $0.0505204, which constituted under section 907(a) of the Act prima facie evidence that none of the burden of the tax was borne by the claimant.

On the other hand, the average margin per unit of Mill 3 during the tax period was $0.4734092 and during the case period $0.5443571, so that the margin during the tax period was lower by $0.0709479 than the margin during the base period and constituted prima facie evidence that the burden of the tax was borne by the claimant to the extent of the difference. The court, however, combined these margins and ascertained thereby that the average margin of the whole enterprise during the tax period was $0.2358710 and during the base period $0.2103924, showing that the average margin during the tax period exceeded the average margin during the base period in the amount of $0.0254786 and therefore constituted prima facie evidence that none of the burden of the tax was borne by the claimant.

The same general result was reached by the court when adjustments, taking into account increased cost of production in the tax period, were made as authorized by § 907(e) of the statute. It then appeared that the average margin of Mills 1 and 2 during the tax period exceeded the average margin during the base period by $0.0195882, whereas a similar calculation with reference to Mill 3 indicated that the average margin during the base period exceeded the average margin during the tax period by $0.04041273. Combining the two figures, the court found that the average margin for the tax period exceeded the average margin for the base period for the whole business by the sum of $0.0083132.

Having reached this result, the court made the broad holding that the claimant had passed on the whole tax to the buyers, including not only the tax on goods processed in Mills 1 and 2, but also the tax on goods processed in Mill 3. If we grant the premise that the products of all the mills should be combined in computing the statutory margins, it is possible to find some evidence to support the decision because section 907(a) provides that if the average margin during the tax period is not lower than in the base period, it shall be prima facie evidence that none of the burden of the tax was borne by the claimant. On the other hand, if the margins are computed separately, the reverse is true as to Mill 3, whose margin was lower, since under the section, such a situation constitutes prima facie evidence that the burden was borne at least to the extent of the excess.

It seems to us quite clear that the method pursued by the court was entirely without justification. It must be borne in mind that the claimant is under no obligation to the United States. The tax liability, although without constitutional basis, was completely liquidated when the claimant paid the entire tax. The question is not how much tax the taxpayer owes the United States but how much refund the United States owes the claimant. Consequently we are

not dealing with two departments of a taxpayer's business, one run at a profit and the other at a loss, where the net result must be ascertained in order to determine a taxpayer's liability for income tax on the whole enterprise. Here the question is whether the taxpayer has borne any part of the tax illegally exacted and is entitled to a refund thereof; and it does not follow that a claimant has not borne any part of the tax on the goods produced in one department of his business because there is some evidence that he did not bear any part of the burden of the tax in another department. The findings of the court do not suggest that it was possible for the claimant in selling the goods manufactured in Mills 1 and 2 not only to shift the tax thereon to the buyers but at the same time also to pass on all or part of the tax on the goods produced in Mill 3.

It is true that section 907(b) (4) provides that where the articles produced are the product of several commodities combined by the claimant during processing, the average margin shall be established with respect to such commodities as a group; but no such condition prevailed in the claimant's business. There was no combination of commodities in the goods produced in Mills 1 and 2 with those produced in Mill 3. On the contrary, as the court found, the manufacturing operations and selling operations were completely separate; the commodities used and the goods produced were of different qualities and values; and the market conditions were diverse. The court seems to have relied entirely on the statutory presumption based on an average margin calculated in a manner that finds no support in the statute or in the facts of the case.

We are in accord in this respect with the holding in I. L. Walker Tobacco Co. v. Commissioner of Internal Revenue, 6 Cir., 129 F.2d 464, where a decision of the Tax Court was reversed wherein two basicly different commodities, burley tobacco and scrap tobacco, were treated as one in calculating the statutory margins on goods produced by a manufacturer of smoking and chewing tobacco. The Circuit Court of Appeals for the Sixth Circuit held that this action was an error of law. It said (p. 467):

"The facts show that the burley was purchased as raw leaf at public auction and was thereafter aged several years before use. The other tobacco was scrapped from the processing of cigars, was purchased from manufacturers, and was used almost immediately, without any processing except the addition of casing. They were bought in separate markets, in varying amounts, at widely disparate prices, and were not mingled in the finished product. The average cost of the burley was around fourteen cents per pound, and of the scrap around twenty-two cents. The dissenting opinion of Member Matthews effectively demonstrates the complete unreliability, and unfairness, of a presumption based upon the treatment of these two commodities as fungible. The unpredictability of calculations so based appears again in the statement of petitioner's counsel, wherein it appears that the addition of one month's transactions, accidentally omitted from the calculations, shifted the presumption from petitioner's advantage to its disadvantage.

"It is manifestly unfair to rely upon a presumption so capriciously realized.

"We think that petitioner's counsel correctly conceived in his opening statement and in Exhibit 2 that the marginal calculations for burley should be kept separate from scrap. * * *"

These considerations require a reversal of the decision below, for it is evident that the Tax Court has given no consideration to the weight of the evidence in its relation to the business of the three mills when considered as two separate operations. The claimant suggests that it is not necessary to remand the case for further consideration by the Tax Court because we have the power and duty to weigh the evidence and to ascertain the extent to which the tax was borne by the claimant and to fix the amount of the refund to which it is entitled. This contention is based upon certain statements in Anniston Mfg. Co. v. Davis, 301 U.S. 337, 351, 352, 57 S.Ct. 816, 820, 823, 81 L.Ed. 1143, wherein the court referred to the duty of the Board of Review to make its determination in accordance with the legal rights of the claimant after finding the facts with respect to the shifting of the tax, and also referred to the power lodged in Circuit Courts of Appeals by section 906(g) of the Act, to review the decisions of the Board of Review and "to direct the Board to enter any designated judgment."

The argument seems to be that under the Act the Board has the power to make findings of fact and then to make a deter-

mination according to the legal rights of the claimant; and while the finding of the facts is the exclusive function of the Board, the reviewing court has power to decide whether the Board's determination is justified by the findings and in the event of error, to determine the amount of the refund.

■ We do not find anything in the opinion of the Supreme Court in the Anniston case to warrant this conclusion. The Supreme Court was demonstrating that the statute was not unconstitutional in abolishing suits against the collector since the administrative procedure before the Board of Review with judicial review of its conclusions by the Circuit Courts of Appeals furnished a fair and adequate remedy. It was obviously not the purpose of the statute to confer upon the appellate courts the power to make an independent determination on the evidence as a whole and to substitute its judgment of the facts for that of the Board of Review or of the Tax Court which succeeded it. The power to make primary and ultimate findings of fact and to draw all proper inferences therefrom is lodged in the trial tribunal. Our function is limited to questions of law. The Supreme Court had no thought of altering the rule laid down in such cases as Hulburd v. Commissioner of Internal Revenue, 296 U.S. 300, 306, 56 S.Ct. 197, 80 L.Ed. 242; Elmhurst Cemetery Co. v. Commissioner of Internal Revenue, 300 U.S. 37, 40, 57 S.Ct. 324, 81 L.Ed. 491; Wilmington Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 86 L.Ed. 1352; Helvering v. Kehoe, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751; Helvering v. Nat. Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346; Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239; Commissioner of Internal Revenue v. Scottish American Inv. Co., 65 S.Ct. 169.

It will therefore become the duty of the Tax Court upon the remand to consider the claims of refund for taxes on the goods produced in Mills 1 and 2 separately from claims for refund on goods produced in Mill 3. Reference has already been made to the finding of the Tax Court that Mill 3 was run at small loss during the tax period, irrespective of the amount of the tax, and that the statutory margins furnish prima facie evidence that the claimant bore some part of the tax on the goods produced. It is the province of the Tax Court to weigh these findings and all other relevant evidence in passing on the claim for refund in respect to Mill 3.

■ In addition, a great deal of evidence was presented with respect to Mills 1 and 2 which the Tax Court should also weigh and consider since it is contended that the claimant also bore a large part of the tax upon the goods processed therein. In so doing the court may not confine itself to a consideration of the prima facie effect of the statutory margins under section 907(a), for section 907(e) provides that the presumption established by subsection (a) may be rebutted by proof of the actual extent to which the claimant shifted the burden of the tax. The court found that the economic factors which affected the business of these mills during the tax period differed widely from those prevailing during the base period. The years 1930, 1931 and 1932 constituted one of the most unprofitable periods in the recent history of the textile industry. In the spring of 1933, however, business confidence was on the way to being restored and as stocks of textiles had reached a low ebb, the demand for the product on the part of the buyers was greatly increased. In July, 1933, the Code of Fair Competition relating to the cotton textile industry was approved and its provisions, together with the increased demand for goods, brought a sharp increase in production and resulted in a serious condition of overproduction by August 1, 1933, the beginning of the tax period. The result was a buyers' market which persisted with little abatement throughout the tax period and since the goods were sold in the open market in New York, prices obtained by the claimant were materially affected.

The contention of the claimant is that these circumstances had so great an effect upon the sales value of its manufactured goods as to minimize if not completely offset the prima facie evidence under section 907(a) of the statute, that the claimant had shifted the burden of the tax on the goods processed in Mills 1 and 2. This argument is supported by a number of calculations based on the findings of the court. For example, it is pointed out that on all sales of goods from Mills 1 and 2 made after the tax took effect on August 1, 1933, the total amount received over and above what would have been received if the sales had been made at the July, 1933, price level was only $38,852.06, although the tax paid was

$346,583.37. It is admitted that the claimant shifted the tax to the extent of $9,280.97 on sales made before the tax took effect but completed afterwards; but it is contended that even if this sum is deducted, the evidence recited indicates that the tax was borne to the extent of at least $298,450.34. There were no compensating reductions in the cost of production during the tax period to offset the effect of the tax. On the contrary, the costs of raw material, manufacturing and selling were greater in every month of the tax period than in July, 1933.

Again, the Tax Court found that during only four of the twenty months of the tax period were the monthly margins for Mills 1 and 2 sufficient to yield the claimant the average manufacturing profit earned during the previous fourteen years. In one month no processing was done and during the remaining fifteen months the margins failed by $172,934.88 to return to claimant the costs of production, the tax and the average profit.

Although the Tax Court made specific findings of fact in detail upon which these calculations are based, it did not discuss the evidence or endeavor to demonstrate on what ground it gave greater weight to the statutory presumption based only on the difference between the sales price of the goods and the cost of the raw material processed than it gave to the evidence designed to show all the elements that entered into the cost of production and the sales price of the manufactured goods. We are therefore unable to express any opinion as to the conclusions of the court insofar as they relate to the claim for refund in respect to the tax on the output of Mills 1 and 2. We hold only that separate consideration should be given to this claim upon the remand in the light of the rule laid down in the statute and applied in numerous decisions, that section 907(e) is as binding upon the Commissioner and the courts as section 907(a) and that all the evidence should be weighed and considered which is pertinent to the contention that the claimant bore the burden of a part of the tax which it paid. See, Epstein v. Helvering, 4 Cir., 120 F.2d 427; Arkwright Mills v. Commissioner of Internal Revenue, 4 Cir., 127 F.2d 465; United States v. Arkwright Mills, 4 Cir., 139 F.2d 454; E. Regensburg & Sons v. Helvering, 2 Cir., 130 F.2d 507; Pyramid Coal Corporation v. Commissioner of Internal Revenue, 7 Cir., 138 F.2d 748; Root & Mc-

Bride Co. v. United States, D.C., 50 F.Supp. 473, affirmed, 6 Cir., 136 F.2d 907; Honorbilt Products, Inc. v. Commissioner of Internal Revenue, 3 Cir., 119 F.2d 797; Franklin Peanut Co. v. Commissioner of Internal Revenue, 4 Cir., 144 F.2d 979.

Reversed and remanded.